UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ESTATE OF WAYNE STEVEN ANDERSON,**<br><br>　　　　　Plaintiff,<br><br>　v.<br><br>**JOHN MARSH**,<br><br>　　　　　Defendant. | No. 1:14-cv-01599-TLN-SAB<br><br>**ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGEMENT** |

This matter is before the Court on Defendant Officer John Marsh's Motion for Summary Judgment. (ECF No. 34.) Plaintiff Estate of Wayne Steven Anderson ("Plaintiff")[1] opposes the motion. (ECF No. 42.) Officer Marsh filed a reply. (ECF No. 47.) For the reasons set forth below, the Court DENIES Defendant's Motion for Summary Judgment, (ECF No. 34).

///
///
///
///
///

---

[1] Wayne Steven Anderson died on June 5, 2015, two years and seven months after the events giving rise to this suit, of causes not directly related to those events. (ECF No. 42-1 ¶ 33.)

1

## I. FACTUAL AND PROCEDURAL BACKGROUND

This case arises out of an officer involved shooting on October 27, 2012, in Fresno, California, involving Wayne Steven Anderson ("Anderson") and the Defendant, California Highway Patrol ("CHP") Officer John Marsh ("Officer Marsh"). (ECF No. 42 at 6–7.)

Officer Marsh was hired as a CHP officer in 2007 and had been assigned to the Fresno area in 2010. (ECF No. 42-1 ¶ 1.) Officer Marsh's primary responsibility was to perform road patrol duties. (ECF No. 42-1 ¶ 1.) Officer Marsh was on patrol on the afternoon of October 27, 2012. (ECF No. 42-1 ¶ 2.) At about 12:44 p.m., Officer Marsh entered the on-ramp to State Route 180 and saw a man later identified as Anderson driving a green Toyota Camry at a high speed. (ECF No. 42-1 ¶¶ 2, 3.) Officer Marsh had not encountered Anderson before and knew nothing about him. (ECF No. 42-1 ¶ 29.)

Officer Marsh followed and turned on his overhead lights at the Freeway 99 interchange. (ECF No. 42-1 ¶ 6.) Officer Marsh activated the siren with a separate switch when he and Anderson merged onto northbound 99. (ECF No. 37-1 at 80:9–15; 81:4–7.) Anderson took the off-ramp for Olive Avenue at 70 MPH, (ECF No. 42-1 ¶¶ 9-11), drove through a stop sign and intersection, and re-entered northbound 99. (ECF No. 42-1 ¶ 9; ECF No. 37-5 at 0:25–0:32.) Officer Marsh relayed this to CHP dispatch. (ECF No. 42-1 ¶ 11.) Pedestrians and vehicles were nearby, though none were directly affected by Anderson's failure to stop. (ECF No. 42-1 ¶ 10.)

The pursuit continued on northbound 99 until Anderson reached the McKinley Avenue exit. (ECF No. 42-1 ¶ 12.) Anderson slowed down and exited the off-ramp at a speed of at least 70 MPH. (ECF No. 42-1 ¶ 12.) From the off-ramp, Anderson skidded across a T-intersection and crashed into a chain link fence bordering the property across from the off-ramp. (ECF No. 42-1 ¶¶ 13–14.) The parties dispute whether this maneuver was due to Anderson driving recklessly and at such high speed that he could not control the Camry or whether the wheels of the Camry "locked-up" so that he was unable to negotiate the turn. (ECF No. 42-1 ¶ 13.)

After the collision, Officer Marsh parked his patrol car behind Anderson's Camry, exited the car, drew his service weapon, ordered Anderson to stop, and pointed it at Anderson. (ECF No. 42-1 ¶¶ 14, 17–18.) Officer Marsh saw Anderson moving or rocking the Camry forward and

backward as if to dislodge his Camry from the fence.  (ECF No. 42-1 ¶ 17.)  Despite Officer Marsh's orders to stop, Anderson continued to rock the Camry back and forth.  (ECF No. 42-1 ¶ 19.)  Officer Marsh approached the driver's side of Anderson's Camry, gun pointed at Anderson, and repeatedly ordered Anderson to show his hands and to stop the car.  (ECF No. 42-1 ¶ 21.)

Officer Marsh states no back up arrived and he did not know how far away back up was or how long it would take to arrive.  (ECF No. 42-1 ¶ 20.)  A fellow officer indicated through dispatch he was in route and Officer Marsh states he could hear the other officers through dispatch.  (ECF No. 42-1 ¶ 20.)  Officer Marsh understood a supervisor was responding and assumed other units were responding.  (ECF No. 42-1 ¶ 20.)  The property on which the chase ended was located within two minutes of the CHP office.  (ECF No. 42-1 ¶ 20.)

Officer Marsh states Anderson had one hand on the gear-shift and one on the steering wheel.  (ECF No. 42-1 ¶ 22.)  Officer Marsh states Anderson then stopped his car and suddenly reached down toward the passenger seat or floorboard, and Officer Marsh lost sight of Anderson's hands.  (ECF No. 42-1 ¶ 24.)  Officer Marsh states he feared Anderson was reaching for a weapon, so Officer Marsh discharged two rounds.  (ECF No. 42-1 ¶ 24.)  One round struck the door frame and the other struck Anderson, permanently paralyzing him from the chest down.  (ECF No. 42-1 ¶¶ 24, 33.)  Officer Marsh did not warn Anderson that Officer Marsh would use deadly force prior to firing.  (ECF No. 37-2 at 16:2–8.)  Officer Marsh radioed to dispatch, "Shots fired (inaudible).  He ran into my car."  (ECF N. 42-6 at 5.)

Moments after the shooting, CHP Sgt. Haller and Officer Heckman arrived on the scene and assisted taking Anderson into custody.  (ECF No. 42-1 ¶ 27.)  The Fresno Police Department arrived and took over investigation of the shooting.  (ECF No. 42-1 ¶ 30.)  Officer Marsh did not inform any officer about the possible presence of a weapon in the Camry.  (ECF No. 37-2 at 25:16–23.)  The subsequent investigation showed Officer Marsh's Mobile Video Audio Recording System ("dash cam") had not been recording.  (ECF No. 42-12 at 19.)  Officer Marsh states he did not know during the incident that his dash cam was not recording.  (ECF No. 42-12 at 19.)  Investigators allowed Officer Marsh to view a videotape of the incident from a business's security camera before asking him any questions.  (ECF No. 42-12 at 19–20.)

The Fresno County District Attorney's investigation concluded Officer Marsh was not criminally liable. (ECF No. 42-1 ¶ 31.) CHP's Central Critical Incident Investigation determined Officer Marsh discharged his weapon in self-defense consistent with department policy. (ECF No. 42-1 ¶ 32.) Anderson sued, then died some months after filing suit. (ECF Nos. 1, 42-1 ¶ 33.)

**II. STANDARD OF LAW**

Summary judgment is appropriate when the moving party demonstrates no genuine issue as to any material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Adickes v. S.H. Kress & Co.*, 398 U.S.144, 157 (1970). Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis of its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file together with affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file." *Id.* at 324 (internal quotations omitted). Indeed, summary judgment should be entered against a party who does not make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

If the moving party meets its burden, the burden shifts to the opposing party to establish that a genuine issue of material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but must tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Fed. R. Civ. P. 56(c). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* at 251–52.

In establishing the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient the "factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First Nat'l Bank*, 391 U.S. at 288–89. The "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Rule 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with any applicable affidavits. Fed. R. Civ. P. 56(c); *SEC v. Seaboard Corp.*, 677 F.2d 1301, 1305–06 (9th Cir. 1982). The evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts pleaded before the court must be drawn in favor of the opposing party. *Anderson*, 477 U.S. at 255. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898 (9th Cir. 1987). Finally, to demonstrate a genuine issue that necessitates a jury trial, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id.* at 587.

### III. ANALYSIS

The parties argue in terms of two separate phases of the incident. The first phase includes the chase leading to Anderson's car crashing into the chain link fence, after which Anderson's car rocked back and forth then stopped. The parties dispute whether there was a second phase during which Anderson made a sudden move with his hands toward the passenger side of the car.

Officer Marsh moves for summary judgment on two bases: that his use of force was objectively reasonable; and that he is entitled to qualified immunity because he did not violate any law that was clearly established at the time. (ECF No. 35 at 13, 18.) Plaintiff argues Officer Marsh and Anderson's conduct is in dispute, but that even if Anderson engaged in some of the conduct attributed to him it did not justify the use of deadly force. (ECF No. 42 at 6.) Plaintiff

5

also argues Officer Marsh is not entitled to qualified immunity as the law regarding use of force in these circumstances was clearly established at the time. (ECF No. 42 at 6.)

### A. Evidentiary Issues

The Court first addresses two evidentiary matters. First, the parties disagree about how to evaluate Officer Marsh's statements and other evidence. Anderson died in 2015, without having been deposed about the events giving rise to this suit. (ECF No. at 42 at 15.) Officer Marsh provided a statement to investigators on the day of the incident in 2012, and then was deposed on February 3, 2016, several months after Anderson's death. (ECF Nos. 42-13 at 33:10-16; 42-4 at 2.) Plaintiff argues "courts cannot 'simply accept what may be a self-serving account by the police officer'" where the only other witness to events, Anderson, cannot testify. (ECF No. 42 at 15) (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)). Plaintiff argues that this Court must "examine all the evidence in the record…to determine whether the officer's story is" internally consistent, is consistent with other facts, and is consistent with circumstantial evidence. (ECF No. 42 at 15) (citing *Cruz v. City of Anaheim*, 765 F.3d 1076, 1079 (9th Cir. 2014); *Clifford v. Clark*, No. 2:11-CV-02591-MCE, 2015 WL 2235404, at *4 (E.D. Cal. May 11, 2015).

Officer Marsh argues *Scott v. Henrich* applies a "heightened scrutiny" standard that is only applicable when a suspect is killed during an incident and so does not have an opportunity to provide his account. (ECF No. 47 at 7.) Officer Marsh notes that in each case Plaintiff cites, the suspect died during the incident. (ECF No. 47 at 7.) Officer Marsh argues *Scott v. Henrich* does not apply because Anderson lived for over two years after the shooting, had the opportunity during that time to submit to a deposition and dispute Officer Marsh's account, and did not do so. (ECF No. 47 at 7–8.) Officer Marsh does not cite any legal authority for his position.

Neither party cites examples of a court analyzing a § 1983 claim in which the plaintiff was available to be deposed after the incident but later died without providing sworn testimony. This Court has found none. The Ninth Circuit has stated the analysis applies "[i]n cases where the best (and usually only) witness who could offer direct testimony for the plaintiff about what happened before a shooting has died. *George v. Morris*, 736 F.3d 829, 834 (9th Cir. 2013). In appropriate cases, Ninth Circuit "precedent permits the decedent's version of events to be constructed

6

circumstantially from competent expert and physical evidence, as well as from inconsistencies in the testimony of law enforcement." *Id*. (affirming a district court's application of the principle in parsing officers' testimony, and evaluating medical evidence and expert testimony for inconsistencies). The Ninth Circuit has applied the analysis from *Scott v. Henrich* in cases in which the plaintiff died as a result of the incident, but has not stated that the plaintiff must have died at the time of the incident or even as the result of an injury sustained during the incident for the analysis to apply.

Here, the only other witness to the events leading to the shooting is Anderson, who died within months of this case being filed. The issues this Court must analyze, and the limitations of doing so without testimony from Anderson, are similar to those cases in which the suspect died as a result of the incident. That the Ninth Circuit has applied *Scott v. Henrich* in cases in which the defendant died as a result of an incident, does not mean it is only applicable in those cases and not applicable here. Accordingly, the Court will apply the *Scott v. Henrich* analysis to this evidence.

Second, Officer Marsh objects to a transcript submitted by Plaintiff of a recording of CHP's dispatch communications during the chase as inadmissible hearsay pursuant to Fed. R. Civ. P. 56(c)(2). (ECF No. 50 at 1.) Officer Marsh has not objected to use of the recording itself, which Officer Marsh submitted to the Court. (ECF No. 49.) "Evidence presented in an inadmissible form during summary judgment can still be considered if it can be produced in an admissible form later at trial." *Pennick v. Lystad*, No. C17-5152-RJB-TLF, 2018 WL 3640207, at *2 (W.D. Wash. June 20, 2018) (citing *Block v. City of Los Angeles*, 253 F.3d 410, 419 (9th Cir. 2001); FRCP 56(c)(2)). The contents of the transcript of the recording is available to this Court in a form admissible at trial—the recording itself, (ECF No. 49), so the Court may consider the transcript at the summary judgment stage. *Id*. Accordingly, the Court overrules Officer Marsh's objection to the transcript and will consider it in deciding Officer Marsh's motion.

B. <u>Reasonableness of Force</u>

Plaintiff asserts a claim under 42 U.S.C. § 1983 for use of excessive force in violation of Anderson's Fourth Amendment right against unreasonable searches and seizures. (ECF No. 23 at 1.) To assert a § 1983 claim, the plaintiff must show the defendant was "acting under color of

state law" and violated a constitutional or federal statutory right. 42 U.S.C. § 1983. The parties do not dispute Officer Marsh was acting under color of law, but Officer Marsh disputes he violated Anderson's Fourth Amendment rights. (ECF No. 35 at 13.)

The Fourth Amendment protects the "right of the people to be secure … against unreasonable searches and seizures." U.S. Const. amend. IV. The Fourth Amendment permits officers making an arrest to use force, but only an amount that is objectively reasonable in light of the circumstances. *Tennessee v. Garner*, 471 U.S. 1, 11 (1985).

Deadly force is force which creates a substantial risk of death or serious bodily injury. *Smith v. City of Hemet*, 394 F.3d 689, 705 (9th Cir. 2005). The parties agree Officer Marsh used deadly force. An officer may use deadly force to prevent a suspect fleeing if the officer "has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or others." *Garner*, 471 U.S. at 11; *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (*en banc*). The inquiry is objective. *Graham v. Connor*, 490 U.S. 386, 397 (1989); *Glenn v. Washington Cnty.*, 673 F.3d 864, 871 (9th Cir. 2011). The vantage point is that of a reasonable officer confronted with the same facts, bearing in mind the decisions occurred in a "split" second and making every effort to ignore the advantages of "20/20 vision of hindsight." *Id*. at 396–97.

Reasonableness of force is usually a fact question for the jury. *A.G.1 by & through Uribe v. City of Fresno*, No. 116-CV-01914-LJO-SAB, 2018 WL 4042906, at *4 (E.D. Cal. Aug. 22, 2018) (citing *Liston v. Cnty. of Riverside*, 120 F.3d 965, 976 n.10 (9th Cir. 1997)). "Because the excessive force inquiry nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, [the Ninth Circuit has] held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Id*. (quoting *Avina v. United States*, 681 F.3d 1127, 1130 (9th Cir. 2012)).

In the Ninth Circuit, "excessive force claims are analyzed in three steps as articulated in *Glenn v. Washington County*." *Davis v. City of Santa Clara*, No. 5:15-CV-05603-EJD, 2018 WL 1524081, at *9 (N.D. Cal. Mar. 28, 2018). Courts first assess "the severity of the intrusion" "by considering 'the type and amount of force inflicted.'" *A.G.1 by & through Uribe*, 2018 WL 4042906 at *3 (quoting *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1056

(9th Cir. 2003)). Second, courts assess the government's interest considering "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. (quoting *Graham,* 490 U.S. at 396; *Blankenhorn v. City of Orange*, 485 F.3d 463, 477 (9th Cir. 2007)). Other factors are "the availability of less intrusive alternatives to the force employed, [and] whether proper warnings were given." *Id*. (quoting *Glenn*, 673 F.3d at 872). Third, courts balance "whether the degree of force used was warranted by the government interest at stake…to determine whether the force used was greater than is reasonable under the circumstances." *Id.* at *4 (quoting *Deorle v. Rutherford*, 272 F.3d 1272, 1282 (9th Cir. 2001). The court balances the intrusion "against the government's need for that intrusion." *Davis*, 2018 WL 1524081, at *9.

        *i.     Step 1: Severity of the Intrusion*

As to the first step, the severity of the intrusion, Officer Marsh shot Anderson, paralyzing him from the chest down. (ECF No. 42-1 ¶ 33.) "The intrusiveness of a seizure by means of deadly force is unmatched." *Garner*, 471 U.S. at 9.

        *ii.     Step 2: The Government's Interest in the Use of Force*

As to the second step, the government's interest in the use of force, the Court considers the severity of the crime, the immediate threat to safety, whether the suspect was attempting to resist or flee, whether less intrusive means were available, and whether proper warnings were given. *Glenn*, 673 F.3d at 872. The most important factor is whether the suspect posed an imminent threat to the safety of the officer or others. *Mattos*, 661 F.3d at 441.

The first phase of the incident includes Anderson leading a high-speed chase, crashing his car into a chain link fence, and then rocking the car back and forth, with one hand on the steering wheel and one on the gear-shift. (ECF No. 35 at 10.) The parties agree Anderson stopped rocking his car back and forth before Officer Marsh shot him. (ECF No. 42-1 ¶ 24.) Officer Marsh states he "did not shoot Anderson to stop his felony evasion." (ECF No. 47 at 8.) Officer Marsh argues "Anderson's recklessness in attempting to evade being stopped was part of the totality of the circumstances" that led him to believe Anderson posed an imminent threat. (ECF No. 47 at 8.)

The second phase, according to Officer Marsh, occurred when Anderson took his hands

off the wheel and gear-shift and reached toward the passenger side in a sudden, "furtive" movement. (ECF Nos. 35 at 10; 47 at 8.) Officer Marsh states he believed Anderson was reaching for a weapon, and argues he perceived Anderson presented an imminent threat of serious harm, that his perception was objectively reasonable considering the totality of the circumstances, and his use of deadly force in response was objectively reasonable. (ECF No. 35 at 13, 16–18.)

This second phase then would represent a significant ratcheting up of the imminent threat of serious harm. Anderson's conduct during the first phase, "willfully resisting, delaying or obstructing a peace officer-has been characterized as a non-serious or non-severe crime for purposes of evaluating a potential Fourth Amendment violation." *Davis*, 2018 WL 1524081 at \*10. The conduct Officer Marsh alleges in this second phase, a suspect suddenly reaching for an area the officer believed had a weapon, in defiance of that officer's commands to show his hands, is conduct that may justify the use of deadly force. *George*, 736 F.3d at 838 ("If the person is armed—or reasonably suspected of being armed—a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat."). Officers are not always required to delay their response until they are faced with a weapon. *Id*.

The question here, in the context of Officer Marsh's motion for summary judgment, is whether any reasonable jury could find it more likely than not that Anderson, at this point in the incident, did not suddenly reach down to the passenger side. *Cruz*, 765 F.3d at 1079 (reversing a district court's grant of summary judgment for defendant officers, and stating a jury would be asked whether the defendant officers saw Cruz reach for his waistband and whether they were entitled to shoot, but the question for a judge deciding a motion for summary judgment is different). As the moving party, Officer Marsh bears the burden to show there is no genuine issue of material fact for a jury to decide. *Celotex Corp.*, 477 U.S. at 323. Officer Marsh argues there is no issue for the jury because his testimony on this point is uncontradicted, since Anderson did not submit to a deposition and refute this point prior to his death. (ECF No. 47 at 7–8.)

Plaintiff disagrees, arguing inconsistencies around the incident call into question Officer Marsh's account and that a furtive movement by Anderson would not justify this shooting. (ECF No. 42 at 17.) Plaintiff argues several aspects of Officer Marsh's account of the incident are not

credible, including (a) the details of the shooting, (b) Officer Marsh's stated reason for the shooting, (c) circumstances of his interview with investigators, (d) why Officer Marsh's dash cam did not record the incident, and (e) details of the chase and speeds reached. (ECF No. 42 at 15–18) (citing *Clifford*, 2015 WL 2235404 at *4 ("If the jury finds that Defendant is not credible, it could find that Clifford was not reaching for the gun.")).

Plaintiff notes it is undisputed that Anderson was not armed, though Officer Marsh could not have known this at the time. (ECF No. 42 at 17.) Plaintiff argues it is more likely than not that Anderson did not reach toward the passenger side when there was nothing there for which he might reach. (ECF No. 42 at 17.) In *Cruz*, the Court reasoned the decedent did not possess a gun, so reaching for one at that time "makes no sense whatsoever," and found a jury may doubt he did so, but may also "reach the opposite conclusion" for many reasons. *Cruz*, 765 F.3d at 1079–80.

Second, while Officer Marsh's account is consistent with videotape from security cameras, and consistency is part of the analysis under *Scott v. Henrich*, the video does not show detail and Officer Marsh learned his dash cam had not recorded the incident and he watched the security cameras' videotape before investigators interviewed him. (ECF Nos. 42 at 10; 42-13 at 33:22–34:15.) Plaintiff notes CHP Lt. Matthew Drewry, the person most knowledgeable about CHP's investigation of the shooting, was deposed. (ECF No. 42-13 at 10:12-20.) Lt. Drewry testified he knew of no policy that CHP officers involved in shootings should be allowed to view the video evidence before being interviewed. (ECF No. 42-13 at 34:5–12.) Lt. Dewey further testified he did not know of another case in which this was done. (ECF No. 42-13 at 34:14–15.)

Third, Plaintiff points to Officer Marsh's statements during the incident and argues they are not consistent with Officer Marsh having shot Anderson because he believed Anderson was reaching for a weapon, but rather because Anderson may have backed into Officer Marsh's patrol car. (ECF No. 42 at 17.) Plaintiff points to evidence that Officer Marsh, when he reported the shooting to dispatch, said "[s]hots fired (in audible). He ran into my car." (ECF No. 42-6 at 5.) Plaintiff also points to Sergeant Sean Haller's statement that Officer Marsh told Sgt. Haller that Officer Marsh "thought the vehicle was trying to run him over." (ECF No. 42-9 at 63:14–25.)

Fourth, Plaintiff argues Officer Marsh only claimed Anderson moved his hands toward the

11

passenger floorboard after learning Officer Marsh's dash cam did not record and he viewed the security camera's videotape. (ECF No. 42 at 17, 24.) Further, Plaintiff argues Officer Marsh did not report a possible weapon to other officers who arrived on the scene. (ECF No. 42 at 17, 24.) Officer Marsh argues there is a reasonable alternate explanation, that Officer Marsh knew the investigators were well qualified and knew how to search the car, and that Officer Marsh was not supposed to communicate with them. (ECF No. 47 at 6.)

Fifth, Plaintiff points to a statement provided by Sgt. DeChamplain stating this incident was a felony stop[2] and Officer Marsh should have used felony stop procedures—to remain in cover until back up arrived to conduct the arrest from the patrol car. (ECF No. 42-3 at 118:20–119:1, 120:13–121:1.) Plaintiff also points to an inconsistency in Officer Marsh's statement that he had no idea when back up would arrive, and so he approached the car. (ECF No. 37-2 at 136:19–24.) Plaintiff points to evidence another officer radioed information that back up was on the way while the chase was ongoing, (ECF No. 42 at 8), and Officer Marsh estimates the crash site was two minutes from the CHP command facility. (ECF No. 42-4 at 141:18–19.) Officer Marsh states he did not hear other officers' radio transmissions. (ECF No. 37-1 at 86:23–25.) However, at the summary judgement stage, the Court accepts the non-movants evidence, and all reasonable inferences drawn from it, as true. *Anderson*, 477 U.S. at 255.

Sixth, Plaintiff argues, the incident should have been recorded. (ECF No. 42 at 7.) Plaintiff points to evidence that Officer Marsh's patrol car was equipped with a dash cam, (ECF No. 42-4 at 43:24-44:3), officers are required to ensure it is working before beginning patrol and to record pursuits, (ECF No. 42-5, Sergeant Alfred Perez Depo. at 24:15-25:11, 28:14-29:7), and Officer Marsh did not do this after he completed a personal errand, so the incident was not captured on the dash cam, (ECF No. 42-4 at 44:9.)

Finally, Plaintiff argues Officer Marsh's account of the chase, that Anderson reached speeds of 90 MPH and 100 MPH at times, is inconsistent with his two reports to dispatch during the chase that Anderson was driving 70 MPH on the off ramps. (ECF No. 42 at 16.) It is

---

[2] Marsh asserts Anderson committed "reckless felony vehicle evasion in violation of California Vehicle Code section 2800.2 ('felony evasion')." (ECF No. 47 at 8.)

12

undisputed Anderson took the off ramps at 70 MPH, but that does not contradict Officer Marsh's statements Anderson travelled faster at other times, (ECF No. 42-1 ¶ 3). It is insufficient for the opposing party "to simply question the credibility of the moving party's witness." *Apulent, Ltd. v. Jewel Hosp., Inc.*, No. C14-637RSL, 2015 WL 11601706, at *3 (W.D. Wash. Apr. 8, 2015).

The Court must evaluate Officer Marsh's account—that Anderson removed his hands from the steering wheel and gear-shift and then made a sudden, furtive, movement with his hands toward the passenger side floorboard, leading Officer Marsh to fear Anderson was reaching for a weapon—for consistency with the facts and circumstantial evidence. *Cruz*, 765 F.3d at 1079. In *Cruz v. City of Anaheim*, the Ninth Circuit reversed summary judgment in a case in which four police officers testified they perceived the decedent reach for a weapon in his waist band, because circumstantial evidence, including the fact that the decedent was unarmed, cast doubt on the officers' account of the incident. *Id*. at 1079.

Here, Anderson was unarmed and Officer Marsh told dispatch and another officer he shot because Anderson backed his car into Officer Marsh's patrol car or may have tried to run over Officer Marsh. Further, Officer Marsh did not warn anyone, either the officers who arrived and assisted in taking Anderson into custody or those who arrived to investigate the shooting, that he suspected there was a weapon in the car. Officer Marsh broke CHP policies in handling the incident by not having his dash cam recording and not waiting for back-up to assist with the stop. While Officer Marsh gave an account of the incident to investigators on the same day—when Anderson was still alive—that is consistent with evidence from the security camera videotapes, the importance of this is undercut by the fact that he viewed the videotapes before investigators interviewed him, which the expert testified was unique in the expert's experience.

Viewing all disputed facts in the light most favorable to the non-moving party, Plaintiff, as the Court must on a motion for summary judgment, a reasonable jury could conclude that Anderson did not make a sudden, furtive reach for the passenger side of the car. *Cruz*, 765 F.3d at 1079; *Longoria v. Pinal Cnty.*, 873 F.3d 699, 708-09 (9th Cir. 2017) (determining a reasonable jury was less likely to accept the officer's account the decedent assumed a "shooter stance" where the decedent did not have a gun, was emotionally troubled, and material facts were in dispute

including whether the officer heard portions of a police broadcast to hold fire).

                *iii.*     *Step 3: Balancing the Intrusion Against the Government's Need for that Intrusion*

As to the third step, the Court must balance Officer Marsh's use of deadly force against the non-severe nature of the crime, and—if a jury finds that Anderson did not reach for the passenger side—the lack of imminent threat to Officer Marsh or others. A reasonable jury could find Officer Marsh's use of deadly force in response to Anderson's resistance was excessive.

Officer Marsh has not met his burden to show his use of force was objectively reasonable under the totality of the circumstances and that no reasonable jury could find for Plaintiff. Accordingly, the Court denies Officer Marsh's motion for summary judgment based on the reasonableness of the force Officer Marsh applied. Officer Marsh, however, also argues he is entitled to qualified immunity and to summary judgment based on that qualified immunity.

          C.     Qualified Immunity

Officer Marsh argues he is entitled to summary judgment on qualified immunity because he did not violate any law that was clearly established at the time. (ECF No. 35 at 13, 18.)

Qualified immunity shields officials from civil liability where a reasonable officer would not have known that his conduct violated a clearly established right. *Anderson v. Creighton*, 483 U.S. 635, 638–39 (1987). "It 'gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law.'" *Davis*, 2018 WL 1524081 at *10 (quoting *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (*per curium*)). "Therefore, regardless of whether the constitutional violation occurred, the officer should prevail if the right asserted by the plaintiff was not 'clearly established' or the officer could have reasonably believed that his particular conduct was lawful." *Id.* (quoting *Romero*, 931 F.2d at 627).

An officer may be denied qualified immunity at summary judgment in a § 1983 suit only if (1) the facts alleged, viewed most favorably to plaintiff, show the officer used excessive force in violation of the Fourth Amendment, and (2) the right was clearly established so a reasonable officer would have known his conduct to be unlawful. *Morales v. Fry*, 873 F.3d 817, 821 (9th Cir. 2017). "[T]he two prongs of qualified immunity balance two important, competing interests:

the need to hold public officials accountable for irresponsible actions, and the need to shield them from liability when they make reasonable mistakes." *Id*. at 822. Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S. Ct. 808, 818 (2009).

"[T]he issue of qualified immunity is usually resolved 'long before trial.'" *Morales*, 873 F.3d at 822 (citing *Hunter*, 502 U.S.at 228). "In particular, the question of whether a particular constitutional right is 'clearly established' is one that the Supreme Court has increasingly emphasized is within the province of the judge." *Id*.

Officer Marsh argues "the law is clearly established that the Constitution permits an officer to use deadly force to defend against a perceived threat caused by a suspect who 'turns and moves as though to draw a gun,' especially when ordered repeatedly to stop and show his hands." (ECF No. 35 at 20) (citing *Thompson v. Hubbard*, 257 F.3d 896, 899 (8th Cir. 2001)). "[C]ourts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan v. Cotton*, 572 U.S. 650, 656, 134 S. Ct. 1861, 1866–67 (2014) (vacating the Fifth Circuit's affirmation of a district court's grant of summary judgment in favor of the defendant officer on the issue of qualified immunity because the district court "credited the evidence of the party seeking summary judgment and failed properly to acknowledge key evidence offered by the party opposing that motion"). "[The d]efendants are only entitled to qualified immunity as a matter of law if, taking the facts in the light most favorable to [the plaintiff], they violated no clearly established constitutional right." *Torres v. City of Los Angeles*, 548 F.3d 1197, 1210 (9th Cir. 2008). Officer Marsh's citations to legal authority "are not persuasive because applying them to this case they would require the Court to resolve factual disputes in favor of" Officer Marsh. *Redmond v. San Jose Police Dep't.*, No. 14-CV-02345-BLF, 2017 WL 5495977, at *12 (N.D. Cal. Nov. 16, 2017).

Plaintiff argues the law was clearly established that officers may not use deadly force against a suspect whom officers stopped after a chase but who did not appear to reach for a weapon or threaten the safety of officers or others. (ECF No. 42 at 24) (citing *Cruz*, 765 F.3d at

1077–78) (overturning a district court's grant of summary judgment because a reasonable jury could find that the defendant officers lied and that the unarmed suspect did not reach for his waist band).³ "The court must deny the motion for judgment as a matter of law if reasonable jurors could believe that [the d]efendants violated [the plaintiff's] constitutional right, and the right at issue was clearly established." *Torres*, 548 F.3d at 1210. The Court has already determined the "record contains sufficient evidence to raise a triable issue as to whether [Officer Marsh] applied excessive force" in violation of the Fourth Amendment in using deadly force against Anderson. *Davis*, 2018 WL 1524081 at *11.

The Court must also determine whether that right was clearly established at the time. *Anderson*, 483 U.S. at 640. Under Plaintiff's version, on October 27, 2012, Anderson was sitting, unarmed, in the driver seat of his car, which was stuck on a chain link fence, it had already stopped rocking back and forth, and Anderson had one hand on the steering wheel and the other on the gear-shift. As of that date, case law "clearly established that an officer may not use deadly force to apprehend a suspect where the suspect poses no immediate threat to the officer or others." *Wilkinson v. Torres*, 610 F.3d 546, 550 (9th Cir. 2010). Further, "it would be clear to a reasonable officer that his conduct was unlawful." *Longoria*, 873 F.3d at 709–10 (denying qualified immunity at summary judgment where fact and credibility issues were to be decided by a jury in a case in which an unarmed suspect was shot after a chase) (quoting *Garner*, 471 U.S. at 11 to state, "The law governing this case is clearly established: 'A police officer may not seize an unarmed, nondangerous suspect by shooting him dead.'"). *See Estate of Clifford v. Placer Cty.*, No. CIV. S-11-2591 LKK/C, 2014 WL 4275959, at *10–11 (E.D. Cal. Aug. 28, 2014) (finding a reasonable jury could conclude Clifford did not make a controlled reach for the gun on the passenger seat, disbelieve Officer Clark's testimony he did, and conclude the use of deadly force was unreasonable and excessive, and the law was clearly established as of the 2011 incident that

---

³ Plaintiff cites *Haugen v. Brosseau*, 351 F.3d 372 (9th Cir. 2003), for the proposition that even if Anderson "had made a 'furtive gesture,' the use of deadly force would not have been justified." (ECF No. 42 at 25.) *Haugen*, however, does not support this proposition. First, the defendant officer stated she shot Haugen, who she knew had a felony warrant and believed had committed a burglary, to stop him from fleeing in a vehicle because people in the immediate area were at risk from his flight, rather than because he reached below the seat of his car. *Haugen*, 351 F.3d at 382. Second, the United States Supreme Court reversed the Ninth Circuit's denial of qualified immunity to the defendant officer. *Brosseau v. Haugen*, 543 U.S. 194, 201, 125 S. Ct. 596, 600 (2004) (*per curiam*).

use of deadly force is unreasonable if the suspect does not pose a threat to the officer or others.) Determining whether a law was clearly established does not "require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741, 131 S. Ct. 2074 (2011).

Officer Marsh is not entitled to summary judgment based on qualified immunity because there is a material issue of fact as to whether Officer Marsh violated Anderson's clearly established constitutional right. *Longoria*, 873 F.3d at 711; *Espinosa v. City & Cnty. of S.F.*, 598 F.3d 528, 532 (9th Cir. 2010) (affirming denial of summary judgment on qualified immunity because "there are genuine issues of fact regarding whether the officers violated [the plaintiff's] Fourth Amendment rights[, which] are also material to a proper determination of the reasonableness of the officers' belief in the legality of their actions"); *Santos v. Gates*, 287 F.3d 846, 855 n.12 (9th Cir. 2002) (stating it was premature to decide qualified immunity "because whether the officers may be said to have made a 'reasonable mistake' of fact or law may depend on the jury's resolution of disputed facts and the inferences it draws therefrom"). Accordingly, the Court denies Officer Marsh's motion for summary judgment based on qualified immunity.

### IV. CONCLUSION

For the foregoing reasons, the Court hereby DENIES Defendant's Motion for Summary Judgment, (ECF No. 34). Further, the Court hereby DENIES as moot Plaintiff's Motion to Reopen to submit further briefing, (ECF No. 54).

The Court further orders the parties to file a Joint Status Report within thirty (30) days of this Order indicating their readiness to proceed to trial and proposing trial dates.

IT IS SO ORDERED.

Dated: December 13, 2018

Troy L. Nunley
United States District Judge

17